# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - -x
                                        :
GEORGE W. LYONS, JR., ALICIA L.         :
STURGESS, MARK C. LYONS, CHAD M.        :
LYONS, DARIA L. O'CONNOR, KENT C.       :
LYONS, M. NATICA LYONS, M. ELIZABETH:
L. POWERS, WILLIAM C. LYONS, JR.,       :
TIMOTHY P. LYONS, MARK C. LYONS,        :
TRUSTEE OF THE GEORGE W. LYONS, JR.     :
FAMILY TRUST,                           :

         Plaintiffs,       :
                                        Civil Action No.
   vs.                                  :
                                        31:01 CV1106
THE BILCO COMPANY,                      : (RNC)

         Defendant.        :

- - - - - - - - - - - - - - - - - - - -x

     Deposition of ROGER F. JOYCE, taken pursuant to the Federal Rules of Civil Procedure, at the law offices of Zeldes, Needle & Cooper, P.C., 1000 Lafayette Boulevard, Bridgeport, Connecticut, before Frances L. Doran, License No. 00192, Notary Public in and for the State of Connecticut, on Wednesday, November 28, 2001, at 9:55 a.m.

SCRIBES, INC.

1   Q.   Now, you told me that, as I understand it,
2   you began using the details at or about the time of the
3   application?
4   A.   Yes, sir.
5   Q.   And was Bilco manufacturing and selling
6   products using that detail starting at about the time
7   of the application?  Did it actually sell product --
8   A.   Yes.
9   Q.   -- that embodied that?
10  A.   Yes, we did.
11  Q.   Can you tell me why it was that Bilco ceased
12  using the detail embodied in the patent?
13  A.   Yes.  We determined that the use of a
14  resilient filler material commonly called a backer rod
15  was unnecessary in the application, so we ceased using
16  that particular piece of material, and once we ceased
17  that particular -- since that particular resilient
18  filler material was claimed in the application for the
19  patent, then the patent no longer applied.
20  Q.   Is the opinion that you've expressed one you
21  reached independently or with the benefit of patent
22  counsel?
23  A.   Oh, patent counsel did review that matter.
24  There was a question, and they reviewed that.
25  Q.   And approximately when did patent counsel

1  review that?
2     A.    Well, approximately the same time we ceased
3  using it, so shortly before that time.
4     Q.    And that is Mr. Delio?
5     A.    Yes, it is.
6     Q.    So with the exception of the absence of the
7  backing material, is Bilco utilizing the system set
8  forth in the patent that you referenced?
9     A.    Other than the backing material, that's
10 correct.
11    Q.    No other differences?
12    A.    That's correct.
13    Q.    Has Bilco applied for patent protection for
14 the use of the system without the backing material?
15    A.    We have not.
16    Q.    And what is the reason you have not?
17    A.    We didn't see the value in doing that in the
18 market.
19    Q.    So is it your understanding that at least as
20 far as the Posi-Flash flashing system is concerned that
21 a Bilco competitor could utilize that flashing system
22 in its products without infringing upon any patent?
23    A.    That's correct.
24              MR. FITZMAURICE:  Objection to the form
25         of the question.

1  entity would not be in violation of any patent
2  protection?
3      A.   That's correct.
4           (Website page regarding automatic fire
5           vent marked Plaintiffs' Exhibit 4 for
6           identification)
7      Q.   Have you participated in discussions with --
8  withdrawn.
9           As I understand it, the only difference
10 between the Posi-Flash system subject to patent
11 protection and the one that is not is the absence of
12 the backing material?
13     A.   That's correct.
14     Q.   And can you share with me why it was that
15 Bilco decided from a cost benefit standpoint it made
16 sense to abandon the patent protection that it had
17 achieved with the patent applied for in 1998 by going
18 to a system that is not protected by a patent?
19     A.   There are two reasons.  One relates to the
20 backer rod itself.  We determined first of all that it
21 was unnecessary.  It was an item that was costly for us
22 to provide.  Even though the raw material wasn't that
23 costly, the labor incurred to provide it with the
24 product was more costly.  That was one reason.
25          The other is that there have been competitors

1  who have designed their own version of this type of
2  device, if you will, and achieved their own patent
3  actually to do a similar type of attachment of the
4  membrane. So there are others out there doing this on
5  their own already, so the patent frankly wasn't
6  particularly helpful in protecting us from them.
7      Q. What is the cost in terms of materials for
8  the installation of the backer rod on a roof scuttle?
9      A. I don't know what that is.
10     Q. Order of magnitude?
11     A. I don't know. I just don't know.
12     Q. Are there documents available that would
13 permit one to make that determination?
14     A. There were -- I recall studies we did at the
15 time that led us to that conclusion. I don't know if
16 they're available.
17     Q. You don't know if the studies are available?
18     A. That's correct.
19     Q. Who did the studies?
20     A. It would have been done by our own analysis,
21 labor analysis of the assembly of the product.
22     Q. And what data or information would have been
23 looked at to make that analysis?
24     A. It would have been an observation of the
25 assemblers and an understanding of the time it took

1    them to put that backer rod in place.
2        Q.   Before I was asking you about materials.
3        A.   Right.
4        Q.   Are data available to permit one to determine
5    the cost of the materials?
6        A.   Yes, sir.
7        Q.   And what data are those?
8        A.   It would be purchase records for the backer
9    rod material.
10       Q.   Do you know whether the cost of the
11   materials, for example, exceeded a dollar?
12       A.   I don't know that.
13       Q.   You don't know.  Who would be in a better
14   position to know that?
15       A.   Well, it's in our records, purchase records.
16   We can provide them.
17       Q.   And in terms of the labor cost, can you tell
18   me what the order of magnitude was for the cost of
19   labor for the scuttles?
20       A.   No.
21       Q.   And how would one determine that?  Is there
22   any quantitative way to determine that?
23       A.   The way to determine that, and the way we did
24   determine that at that time, was through observation of
25   the assemblers who were actually performing the work.

1   Q.   Does Bilco maintain productivity records in
2   terms of how many scuttles it manufactured based on the
3   number of people that performed the work?
4   A.   Yes, sir.
5   Q.   And would it be a simple transaction --
6   withdrawn.
7        If one were to determine the time spent with
8   respect to the backer rod, would it be appropriate to
9   look at the productivity records from the time that the
10  backer rod was utilized and compare them to the records
11  that do exist recognizing now that you're no longer
12  utilizing the backer rod?
13  A.   I would say that would not be useful.
14  Q.   Why not?
15  A.   Because there are other factors that apply,
16  and one cannot isolate one through the time of
17  analysis.
18  Q.   So how would one isolate that work?
19  A.   By observation.
20  Q.   You can't tell me now what you did yourself
21  other than when you were -- when the company was making
22  this decision?
23  A.   Yes.
24  Q.   Approximately when did the company make this
25  decision to forsake the backer rods?

1   A.   Well, this is at the time we discussed
2   earlier, approximately one year after the application.
3   Q.   Okay. And in terms of what you told me, you
4   have no present recollection as to when your assessment
5   was of how long it took?
6   A.   That's correct.
7   Q.   Do you recall the order of magnitude? Was it
8   a matter of seconds, minutes, hours?
9   A.   It was definitely minutes of those three.
10  Q.   More than two, ten?
11  A.   I don't recall.
12  Q.   Okay. Did anyone else participate with you
13  in making these observations?
14  A.   I don't recall.
15  Q.   Has any assessment been done by Bilco as to
16  whether the Posi-Flash system presents any increased
17  risk of injury to workers compared with that of the
18  Bilco system?
19            MR. FITZMAURICE: Object to the form of
20        the question.
21  A.   Can you clarify what you mean by "workers?"
22  Q.   I'm sorry. That's a fair objection. Whether
23  the Posi-Flash system posed any increased risk of
24  injury to installers of the scuttle than on the Bilclip
25  system?

```
 1      Q.   I'm referring to Exhibit 17 the fourth
 2   supplemental agreement.
 3      A.   Can I see that?
 4      Q.   Sure.
 5      A.   This is not the document that I was referring
 6   to.
 7      Q.   Okay.  You told me that the Posi-Flash with
 8   the backing, the one that's referenced in the Robert
 9   Lyons, Sr. patent would not absolve Bilco of its
10   obligations to pay royalties to the patent pool
11   members; correct?
12      A.   Correct.
13      Q.   And why is that the case?
14      A.   Because the patent was issued with claims
15   that included the backer rod in each of the claims as
16   they did in the Bilclip patent so that it was seen as
17   an improvement over the Bilclip but did not necessarily
18   supersede it for the purposes of the patent.
19      Q.   Are you telling me that the Robert Lyons, Sr.
20   patent infringed on the Bilclip patent?
21            MR. FITZMAURICE:  Objection to the form
22            of the question.
23      Q.   Are you telling me that the roof scuttle and
24   other products manufactured pursuant to the Robert
25   Lyons, Sr. patent infringed on the Bilclip patent?
```

1       A.   No.

2            MR. FITZMAURICE:  Objection to the form

3       of the question.

4       Q.   Explain to me the basis for your belief that

5  the improvements to the product as you've referenced

6  did not eliminate Bilco's obligation to pay royalties.

7       A.   As we understood it from counsel's

8  explanation, patent counsel's explanation, the

9  improvement was not significant enough to differentiate

10 this Posi-Flash from the Bilco with respect to patent

11 pool payments.

12      Q.   Are you telling me as a matter of contract

13 interpretation or as a matter of patent law?

14      A.   I'm not sure I can answer that.  We followed

15 the advice of or accepted the advice of patent counsel.

16      Q.   Mr. Delio?

17      A.   Right.

18      Q.   And did you present Mr. Delio -- were you

19 asking him to interpret the company's obligations under

20 the patent pool documents?

21      A.   We did specifically, yes.

22      Q.   Just so I understand again Bilco's position,

23 if Bilco was continuing to ship out the Posi-Flash

24 system with the backing material in it, Bilco would

25 have an obligation to pay royalties, but by shipping it

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GEORGE W. LYONS, ALICIA L. STURGESS, MARK C. LYONS, CHAD M. LYONS, DARIA L. O'CONNOR, KENT C. LYONS M. NATICA LYONS, M. ELIZABETH L. POWERS, WILLIAM C. LYONS JR., TIMOTHY P. LYONS, MARK C. LYONS, TRUSTEE OF THE GEORGE W. LYONS JR., FAMILY TRUST<br><br>V.<br><br>THE BILCO COMPANY | Civil Action No.: 3:01CV1106 (RNC) |

## AFFIDAVIT OF MICHAEL A. CANTOR

I, Michael A. Cantor, being duly sworn, hereby deposes and states as follows:

1. I am over 18 years of age and I understand and appreciate the obligations of an oath.

2. I am an attorney licensed to practice and in good standing in the state of Connecticut.

3. I am presently employed as a Partner in the intellectual property law firm of Cantor Colburn LLP in Bloomfield, Connecticut. I am also an Adjunct Professor at the University of Connecticut School of Law, where I teach patent law and procedure.

00961.000/326433.2

4.  Counsel for the Defendant, The Bilco Company ("Bilco"), has retained me to render certain opinions and to testify at trial in the subject litigation regarding whether Bilco's roof scuttles ("scuttles") and sidewalk door products infringe certain patents owned by Bilco but for which Bilco is obligated to pay royalties to Plaintiff George W. Lyons, Jr. pursuant to a "Patent Pool" agreement as discussed in the Complaint in this action. The nature of my opinions in this regard, as well as information regarding my compensation, my qualifications, my prior testimony, and my technical and legal background are set forth in the Expert Witness Statement of Michael A. Cantor that I prepared and signed on or around August 23, 2002 (hereafter "Expert Report").

5.  I have reviewed the facts, opinions, conclusions, and Exhibits set forth in my Expert Report dated August 23, 2002 and attest that they are true and accurate to the best of my knowledge and belief. I incorporate in full my Expert Report dated August 23, 2002 in this Affidavit. My Expert Report is attached to this Affidavit as Exhibit 1.

6.  I have been asked to prepare and present this Affidavit in order to comment upon, clarify, and, where appropriate, correct certain statements made by Plaintiff in his summary judgment pleadings.

7.  Prior to preparing this Affidavit, I reviewed the Expert Report that I prepared on or around August 23, 2002 and the Exhibits attached thereto. Additionally, I reviewed the summary judgment pleadings and affidavits filed by each of the parties in this case.

8. I understand that Plaintiff George W. Lyons, Jr. contends that Bilco made a "*de minimis*" modification to its roof scuttle product to avoid infringement of U.S. Patent No. 4,941,300, entitled Roofing Membrane to Roof Opening Ceiling System and Hatchway Employing the Same ("the '300 Patent"). I understand the Plaintiff's allegation to be that this so called *de minimis* modification was the elimination from the roof scuttle of the "resilient filler material" required by the claims of the '300 Patent.

9. It is my opinion to a reasonable degree of certainty, based upon my 20 years experience as a patent attorney (as outlined more fully in my Expert Report), that the United States patent law does not recognize the concept of a "*de minimis*" modification of a product in analyzing whether a particular product infringes a particular patent.

10. It is my understanding that Bilco is obligated to pay a royalty to the Patent Pool participants for the sale of any Bilco products made in accordance with the claims of any of the patents in the Patent Pool. In other words, I understand that Bilco must pay a royalty to the Patent Pool members based upon sales of any of its products that "read upon" or are "covered by" the Patent Pool patents.

11. In light of the foregoing, it is apparent that the appropriate analysis with regard to whether the sale of a particular Bilco product must result in a royalty payment to the Patent Pool depends upon whether the product at issue reads upon or covers at least one of the Patent Pool patents.

12. As noted, the concept of a "*de minimis*" modification of a product plays no role in analyzing whether a particular product reads upon a particular patent. Rather, the issue is simply one of infringement; if the modified scuttles or sidewalk door products read upon or are covered by the claims of the patents at issue, then Bilco properly owes a royalty payment for sales of those modified products; conversely, if the modified roof scuttles and sidewalk door products do not read upon or are not covered by any claims of the patents at issue, then no royalty payment would be owed.

13. It is my opinion to a reasonable degree of certainty that the patent laws of the United States do not require a royalty payment on the sale of a product which was previously covered by a patent but which has since been modified so as not to read upon the patent, even if the modification is "*de minimis*." The product either reads upon the patent or it does not. If the former is true, a royalty is owed; if the latter is true, then no royalty is owed.

14. Sections VI (5)-(9) of my Expert Report explain in detail the proper infringement analysis as established by the United States Supreme Court and the Federal Circuit. Exhibit 1, pp. 8-10. Moreover, Sections VI (C)(1) and (2) of my Expert Report explain in detail why, utilizing the appropriate infringement analysis, the Bilco roof scuttle product does not infringe the '300 Patent, either literally or under the doctrine of equivalents, when the resilient filler material is eliminated. *See*, Exhibit 1, pp. 17-20.

15. Thus, whether the elimination of the resilient filler material from the Bilco roof scuttle product is a "*de minimis*" modification is irrelevant. The significance of this design modification is that it removes Bilco's roof scuttle products from the scope of coverage afforded by the '300 Patent. In other words, Bilco's roof scuttle product does not read upon the '300 Patent, either literally or under the doctrine of equivalents. *See*, Exhibit 1, pp. 17-20. Therefore no royalty is owed.

16. It is also my opinion to a reasonable degree of certainty, based upon my 20 years of experience as a patent lawyer and my involvement in various transactions, wherein it was necessary to place a value upon certain patents, that patents such as the '300 Patent which are easy to design around are of limited utility and value.

17. In my opinion, the first questions in evaluating the financial worth of a patent are (a) what is the scope of the claims and (b) is the patent valid. With respect to the first question, if the scope of the patent claims is broad and provides expansive coverage over a particular technology, then the patent is worth more than if its claims are narrow and only cover a small portion of the field.

18. With regard to Bilco's roof scuttle product and the '300 Patent, the redesign appears to have been particularly simple and inexpensive, requiring only the elimination of the resilient filler material. The result, as I understand it, is a product which functions equivalently to the old version but which costs less because it eliminates the material cost and labor cost associated with providing the patented feature. In fact, since the re-designed

roof scuttle functions equivalently but is cheaper, it may fairly be characterized as a superior product to the prior version.

19. It is my opinion, to a reasonable degree of certainty, that the ease with which a competitor could have redesigned a roof scuttle around the '300 Patent rendered that patent generally ineffective and of relatively little value.

Signed and sworn to on this 21st day of March, 2003.

_____
Michael A. Cantor

STATE OF CONNECTICUT )
                                    ) ss. Town of Bloomfield     March 21, 2003
COUNTY OF Hartford )

       Before me, appeared Michael A. Cantor and made oath to the truth of the matters contained herein.

                                                       _____
                                                       Commissioner of Superior Court
                                                       Notary Public
                                                         My Commission Expires:

                                                           ELAYNE A. EULIANO
                                                            NOTARY PUBLIC
                                                           MY COMMISSION EXPIRES OCT. 31, 2005