APPENDIX

**Factual Background Regarding Known Risks to Patent Pool Value
Ignored by Plaintiffs' Expert Report**

A.  **The Patent Pool Agreement**

Plaintiffs are former shareholders of Bilco.  On June 21, 1999, the parties executed a Settlement and Reorganization Agreement ("the 1999 Agreement") whereby Bilco agreed to purchase Plaintiffs' shares in Bilco in exchange for Bilco's shares in its real estate venture, Fairfax Properties, Inc., and cash.  Ex. A.[1]  Bilco also agreed under the Settlement Agreement to continue to pay royalties on sales of products containing certain patented items that are the subject of a Patent Pool Agreement ("PPA").  Ex. A.

Under the PPA, Bilco payments to the Patent Pool equaled five percent of the sales price of all Bilco products sold that embodied the technology of the patents.  R9-40.  In 1998, for example, Bilco paid to the Patent Pool approximately $1.6 million, or approximately $320,000 to each of the five owners.  R9-45.  The value of Bilco's royalty payments to the Patent Pool and, correspondingly, the value of the Patent Pool itself, had an inverse

---

[1] Alphabetical exhibit citations are to Bilco's exhibits submitted in connection with its summary judgment papers.  Those exhibits have not been reproduced with this Motion in order to reduce the volume of the parties' Joint Trial Memorandum submission.  Bilco will reproduce any exhibits upon the Court's request.  Numerical exhibit citations are to exhibits accompanying this Appendix, which exhibits were not part of Bilco's summary judgment exhibits.  Citations to "R9-__" are to Bilco's Rule 9(c) statement submitted with its November 22, 2002 motion for summary judgment to which Plaintiffs admitted.

relationship to the value of the company: a reduction in Patent Pool payments would result in an increase in the value of Bilco shares. Depos. Mark Lyons, May 29, 2002 at 34-35 (Ex. 1).

**B.    Historical Obsolescence of Patents in the Patent Pool**

Over the life of the Patent Pool, products were redesigned and technology enhanced such that certain patents became obsolete. Plaintiffs knew this when they hired their expert witness, Joshua Teplitzky.

Prior to the execution of the 1999 Agreement, Bilco furnished Plaintiffs with two schedules which demonstrated this historical trend. The first, entitled "Patents Applicable to Agreement of Sale of Certain Inventions Through Fifth Supplemental Amendment," Ex. K, listed by United States patent number and described all patents which were included in the Pool between 1952 and 1994 when the Patent Pool closed. The list included thirty-six United States patents. Ex. K.

A second schedule, entitled "Products Currently Sold By Bilco That Embody one or More Patents Applicable to Agreement of Sale of Certain Inventions Through Fifth Supplement Amendment" as of June 21, 1999, Ex. J, listed by United States patent number all patents that remained in use in 1999. Only ten United States patents were included. Accordingly, as of the 1999 Agreement, only ten of the thirty-six U.S. patents that were ever included in the Patent Pool were providing revenue to the Pool owners. Ex. J.

Plaintiff George Lyons, Jr. well understood the notion of patent obsolescence as related to the Patent Pool. On March 27, 1999, he wrote to Plaintiff Mark Lyons:

> Because some percentage of sales will be uncovered by patents as some go off line and others come on—that is the way it works . . . patent values run out over time . . . .

Ex. CC. Accordingly, throughout the history of the Patent Pool there was the ever-present risk that Patent Pool royalties would decrease by virtue of the obsolescence of Patent Pool patents.

### C.     The Risk of Redesign

The documented historical obsolescence of Patent Pool patents was rooted in Bilco's ever-evolving product line where old patented features were replaced by new technology. In addition to this risk of historical obsolescence, however, was the attendant risk that Bilco could simply redesign its products for the purpose of reducing its liability to the Patent Pool. Plaintiffs were well aware of this risk before the 1999 Agreement and, in fact, tried to eliminate this risk through a revision to the PPA. As shown below, that attempt failed and Plaintiffs assumed the risk of redesign when they executed the 1999 Agreement.

In 1994, Bilco and the five Patent Pool owners amended the Patent Pool Agreement in the "Fourth Supplemental Agreement to Agreement of Sale of Certain Inventions" (the

"Fourth Amendment").  Ex. FFF.  Section 2(c) of the Fourth Amendment confirmed Bilco's right to design products to reduce royalty payments.  It provided that Bilco

> may proceed to implement research and product development capabilities independent of those previously provided by [Pool owners]. *In the event that future inventions or product improvements result in products being manufactured by [Bilco] which no longer embody inventions described in Paragraph 1,* [Bilco] shall have no obligation to make any payments to [Pool owners] with respect to such products. In the event that future inventions result in products being manufactured by [Bilco] which embody both such future inventions and inventions described in Paragraph 1, no reduction shall be made in the payments due to [Pool owners] as the result of the addition of such future inventions.

(emphasis added).  Ex. FFF.

The Patent Pool owners amended the PPA again shortly before the 1999 Agreement in the "Fifth Supplemental Agreement to Agreement of Sale of Certain Inventions" (the "Fifth Amendment").  Ex. GGG.  Under the Fifth Amendment to the PPA, the Patent Pool owners agreed that Patent Pool payments would cease in April 2013.  Ex. GGG.  As of the date of the 1999 Agreement, therefore, the Patent Pool represented a continuing liability of Bilco for the next 14 years.

In negotiations preceding execution of the Fifth Amendment, certain Plaintiffs discussed with their counsel and among themselves a need to incorporate language in the Fifth Amendment that would prevent Bilco from eliminating royalty payments "by just

4

designing out of the Patents for the only reason being to avoid payment of Royalty." Ex. L; *see* Exhs. Z; BB; CC; MMM.  In negotiations over the Fifth Amendment, Plaintiffs' counsel went so far as to propose a revision to eliminate Paragraph 2(c) from the Fourth Amendment. Exhs. II; JJ.  The revision, however, was rejected by Bilco and was not incorporated into the final agreement.

Accordingly, Plaintiffs clearly knew well before the 1999 Agreement that there was a risk that Bilco could design products to reduce its Patent Pool liability and reduce royalty payments.  Indeed, Plaintiffs suspected prior to the 1999 Agreement that Bilco was planning to do just that.  On March 27, 1999, Plaintiff George Lyons, Jr. wrote to Plaintiff Mark Lyons:

> I have the evidence that they [Bilco] are developing products *for the purpose of reducing patent pool payments*.

Ex. CC.  Between the 1999 Agreement, and Mr. Teplitzky's valuation in 2002, nothing occurred to reduce this risk of redesign.

### D.      The 1997 Duff & Phelps Valuation

In July 1997, Duff & Phelps performed a valuation of Bilco (the "Duff and Phelps Report") "for the purpose of reviewing various strategic restructuring options available to the

5

shareholders of Bilco." Ex. 2, at 2. Duff & Phelps's ultimate recommendation contemplated a complete buyback of the Patent Pool from its owners:

> *Recommendation*
> Duff & Phelps recommends that any transaction contemplated includes a provision that calls for the buyback or prepayment of the royalty stream from the royalty holders in either stock in Bilco or cash. This will enable the Company to increase its cash flow from operations, permitting additional debt service.

Ex. 2, at 17. Accordingly, Duff & Phelps assumed that Bilco would buy out the Patent Pool owners in a lump-sum payment, eliminating any future liability to the Patent Pool.

This assumption, of course, was built into Duff & Phelps's approach for calculating the value of the Patent Pool. According to the 1997 Duff & Phelps Report, the then present value of the Patent Pool was $10 million. Ex. 2, at 2, 17. The Report also projected an annual 3% increase in the value of the Patent Pool to account for inflation. Ex. 2, at 17. Because the Duff & Phelps Report assumed a one-time buyout of the Patent Pool, rather than a continuing liability, the valuation did not account for risks that may reduce the future royalty stream, such as the risk of redesign or patent obsolescence.

### E.  **Plaintiffs' Criticisms of the Duff & Phelps Report**

In connection with their deliberations regarding the 1999 Agreement, Plaintiffs retained their own economic advisor, J. Allen Kosowsky, to evaluate Bilco and to evaluate

the Duff & Phelps Report. They did this because, from the outset, Plaintiffs regarded the Duff & Phelps Report as slanted toward management. The documentary evidence surrounding this criticism evidences the extent of Plaintiffs' knowledge of the inherent risks of the Patent Pool. As shown in Bilco's Memorandum of Law, Plaintiffs' expert did not consider those risks.

More than one year prior to June 21, 1999, Mr. Kosowsky advised the Plaintiffs that: 1) the Duff & Phelps Report had improperly valued both Bilco and the Patent Pool liability; 2) the Duff & Phelps Report had *undervalued* (not overvalued) the Patent Pool liability, by more than $10 Million; and 3) the Duff & Phelps Report incorrectly valued Bilco for many other reasons. Ex. T. According to Mr. Kosowsky, the proper value of the Patent Pool was anywhere between $10 million and $20 million. Ex. T at 3.

Plaintiffs, through a series of memoranda commenting on the Patent Pool liability, lamented the Duff & Phelps Report. More than one year before the 1999 Agreement was signed, Plaintiff William Lyons, Jr. dispelled any notion that Plaintiffs would rely on the Duff & Phelps Report. On March 25, 1998, commenting to his counsel on the perceived management slant of the Duff & Phelps Report, he said: "Why do I feel ripped off." Ex. R.

In May 1998, either Mark Lyons or William Lyons, Jr., after noting that Mr. Kosowsky had previously raised many questions with regard to the Duff & Phelps Report,

criticized Duff & Phelps's assumption that royalty payments would continue to grow steadily:

> **The royalty payments are assumed to be immutable but in reality they could be capped, reduced or eliminated as appropriate during an economic downturn.** This could easily be prearranged by the five brothers.
>
> The royalty payment (sic) are assumed to be a constant 5% of all revenues into the future. How will sales of non-pool products such as Scapewell be treated? **What about new products developed internally by others at Bilco that do not use the patentable features of the current products? Will the royalties be paid on these products?**

Ex. U (emphasis added). These questions were unanswered by the Duff & Phelps Report.

Throughout the negotiation process, Plaintiffs recognized that the Duff & Phelps Report did not reflect the risk that Bilco could redesign products to reduce or eliminate payments under the Patent Pool. Plaintiff Mark Lyons, who holds a Master's Degree in Business Administration (R9-143), explained this risk in detail to his counsel at the time, Attorney Mario Zangari. In March 1999, Mark Lyons specifically criticized both the Duff & Phelps analysis of the Patent Pool liability and the analysis prepared by Mr. Kosowsky for failing to reflect the risk that Patent Pool payments would decrease because Bilco would design around the patents. Ex. X.

On March 16, 1999, Mark Lyons wrote to his counsel:

>The discussion [of the Duff & Phelps Report] fails to address fully our two key concerns, which are:
>
>>a -   the distinct possibility that Bilco will eliminate or reduce the amounts of the payments in the future by eliminating the patentable features in certain of its products even before the patents embodied in those products expire; and
>>
>>b -   the expiration of the last patents in certain product lines will cause Bilco to stop paying royalties on those product lines. This would be fine and logical except that both Duff & Phelps and Allen Kosowsky did present value calculations for the Pool based upon 5% of all sales for the remaining life of the last patent.  *If these calculations are wrong then the value of Bilco stock is wrong*.

Ex. X (emphasis added).  Mark Lyons then suggested to his counsel that the Patent Pool should be revalued:

>>3 -   *I suggest that we immediately proceed to re-value the Patent Pool (as proposed in your draft of the Fifth Supplemental Amendment page) and get Bilco management to disclose their interpretation of its present value.  Then both sides will agree to the methodology, discount rate and a reasonable range of values*.

Ex. X (emphasis added).

Attorney Zangari endorsed Mark Lyons's position that the Patent Pool liability should be revalued saying "This is a good point."  Ex. Z.  In a March 17, 1999 Memorandum, Attorney Zangari responded to Mark Lyons's revaluation suggestion:

9

> 2.  **Review the valuation of Bilco stock because the present value of calculations for the Patent Pool are based upon 5% of all sales when in fact certain product lines could be eliminated.**
>
>     This is a good point. Again, the current agreements do not allow the Patent Pool to require Bilco to maintain certain product lines and requiring Bilco to do so would be *economically indefensible*.

Ex. Z (emphasis added). In the same Memorandum, Steering Committee counsel also said:

> 1.  **Can the agreement be amended to prevent Bilco from reducing payments by eliminating the patentable feature in certain products before the patents embodied in those products expire?**
>
>     The current agreement and amendments allow Bilco to sell any products it wishes. If a product happens to contain one or more of the patentable items, then a royalty is due. As currently written, there is no way for the Patent Pool to force Bilco to continue to include certain patent features in a product or to prevent Bilco from eliminating a product line.

Ex. Z.

Plaintiffs allege that they based their decision to sell their Bilco shares at the price they did in reliance on the Duff & Phelps Report that valued Bilco's liability to the Patent Pool at $10 million. Complaint, ¶ 13. Plaintiffs clearly knew, however, that the Duff & Phelps Report failed to account for known and/or perceived risks and, therefore, that it overvalued Bilco's liability to the Patent Pool while understating the value of their Bilco

shares. As demonstrated in Bilco's Memorandum of Law, Plaintiffs never shared that knowledge with their expert witness in connection with his valuation of the Patent Pool, leaving a gaping hole in the soundness and reliability of his conclusions.